UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KENNETH HALL,                          )
                                       )
         Plaintiff,                    )
                                       )
         v.                            )        CAUSE NO. 3:11-CV-72 CAN
                                       )
MICHAEL J. ASTRUE                      )
Commissioner of Social Security,       )
                                       )
         Defendant.                    )

## OPINION AND ORDER

On September 6, 2011, Plaintiff, Kenneth Hall ("Hall"), filed his complaint seeking

review of the final decision of Defendant, Commissioner of Social Security ("Commissioner").

Hall filed his opening brief on September 6, 2011, and Commissioner filed his response on

December 14, 2011. Hall filed his reply brief on January 25, 2012. This Court now enters its

ruling based on the consent of the parties and 28 U.S.C. § 636(c).

## I.   PROCEDURE

On April 1, 2008, Hall filed his application for disability insurance benefits, alleging a

disability onset date of May 1, 2002. He was initially denied benefits on August 29, 2008, and

again upon reconsideration on October 28, 2008. Hall testified before an Administrative Law

Judge ("ALJ") on March 17, 2010. On April 30, 2010, the ALJ issued her decision denying

Hall's application for benefits. Hall then filed his complaint in this Court pursuant to 42 U.S.C.

§ 405(g).

## II.  RELEVANT BACKGROUND

Hall was born on September 24, 1967 and was 42 years old when the ALJ issued her

decision (Tr. 130). He has a ninth grade education, and has past relevant work experience as a

metal fabricator and iron pourer (Tr. 28, 46).

**A.     Medical Evidence**

In February 2001, Hall went to the hospital complaining of back pain after jumping off of a log (Tr. 268).  He was diagnosed with acute back pain and compression of the spinal nerve on the right side (Tr. 269).  In March, an MRI of his lumbar spine was taken and showed a herniated disc (Tr. 253).  On March 20, 2001, he underwent lumbar decompression surgery (Tr. 261).

In 2005, Hall began complaining of cervical pain, so he began physical therapy in October 2005 (Tr. 450).  He had decreased range of motion ad strength, and he had pain in his neck (Tr. 453).  However, Hall reported that he was independent in activities of daily living, so his rehabilitation potential was noted as good (Tr. 452-453).

In January 2006, Hall went to Dr. Case, his primary physician, with complaints of nerves and anxiety (Tr. 492).  He was prescribed a medication and told to return in two weeks.  *Id*.  In May 2006, Hall went to Dr. Case complaining of pain in his right shoulder that radiated to his arm (Tr. 489).  The examination showed tenderness of the muscles around the neck and spine and a tingling sensation in his neck (Tr. 489).  He was prescribed medication and taken off of work for two days (Tr. 489).  In August 2006, he returned to Dr. Case because he was having trouble turning his mind off at night after his wife and children left him (Tr. 487).  He had thoughts of suicide, but no plan in place or intentions to harm himself.  *Id*.

In June 2007, Hall went to the emergency room complaining of sharp pain in his right lower back, but no pain radiating to his legs (Tr. 384).  The examination showed no radiating pain, no numbness or tingling, no tenderness in the joints or hips, normal strength in the lower extremities, and the ability to walk without difficulty (Tr. 385).  He was prescribed medication

and told to follow up with his primary physician.  *Id.*

In March 2008, Hall voluntarily checked himself into a detoxification clinic in order to detoxify from morphine (Tr. 296).  After examination, he was diagnosed with major depression, cannabis abuse, and a personality disorder (Tr. 298-299).  He was given a Global Assessment Functioning ("GAF") score of 20, but this increased to 55 by the time he was discharged (Tr. 299).[1]

Hall underwent a consultative examination in July 2008 at the request of the agency (Tr. 570).  Hall told the examining physician that he had pain in his legs and was depressed (Tr. 570). The examination showed that Hall had a normal gait and he was able to squat, stand, and walk on his heels and toes (Tr. 571).  Neurologically, he was intact.  *Id.*  The examining physician diagnosed Hall with back and neck pain, depression, a mass in his lung, and chronic marijuana abuse and opiate dependence (Tr. 572).  In August 2008, a reviewing physician concluded that Hall's impairments were not severe and thought that he was only partially credible (Tr. 577).

In August 2009, Hall voluntarily admitted himself to a clinic after he made threats that he wanted to commit suicide (Tr. 654).  Dr. Negi, his treating psychiatrist, examined him and noted that Hall's judgment was poor, his intellect was average, and that Hall had suicidal thoughts, but no plans to hurt himself (Tr. 662).  Hall was given a GAF score of 20 (Tr. 663).  In November 2009, Hall returned to Dr. Negi stating that he was trying to get disability benefits (Tr. 644).  The examination showed that Hall had good eye contact, was cooperative, alert, and had no thoughts of suicide or homicide (Tr. 646-647).  He reported that the last time he used any drugs or alcohol

---

[1] GAF scores represent on a single day an individual's overall level of functioning, including symptom severity.  The GAF numeric scale runs from 0 through 100.  The higher the GAF score, the less severe the symptoms and the individual will have a higher level of functioning.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000)(DSM-IV).

was about nine months prior (Tr. 646).  He was given a GAF score of 55 (Tr. 648).

Dr. Negi completed a mental medical source assessment (Tr. 642).  He found that Hall was not able to perform his designated task or function on a regular, reliable, and sustained schedule, or work in coordination with or proximity to others without being distracted by them. *Id*.  He also noted that Hall had moderately severe limitations in understanding and remembering, sustaining concentration and persistence, and interacting socially and adapting. *Id*.  Dr. Negi believed that Hall would have difficulty more than twenty percent of the work day performing these job tasks.  *Id*.

On September 15, 2009, Hall received a cervical epidural steroid injection for his neck and low back pain (Tr. 672).  On September 30, he reported that his back pain had been increasing, but by February 24, 2010, he reported that he was doing well with his current medication regimen (Tr. 672, 665-670).

**B.      ALJ Hearing on March 17, 2010**

**1.      Hall's Testimony**

At the ALJ hearing, Hall testified that he could not work because of nerve damage in his neck (Tr. 33).  He stated that this caused pain in his lower back, neck, arms, and fingers.  *Id*. Hall said that it hurt to bend, kneel, or squat.  *Id*.  Hall believed that he could lift and carry forty to fifty pounds, so long as he could carry it at his side (Tr. 35).  Further, he thought that he could walk a mile or more before he had to stop and sit (Tr. 37).  Hall said that he needed to alternate between sitting and standing in order to relieve his pain (Tr. 43).

Hall also testified that he was depressed and had panic attacks several times per month (Tr. 34-35).  Additionally, Hall had difficulties concentrating and getting along with others (Tr.

38, 43), but said that he occasionally read the Bible and watched TV with his neighbors (Tr. 44). He admitted to smoking marijuana once or twice per week, but said that he no longer drank alcohol (Tr. 41). After his attorney questioned him, he stated that he had irritable bowel syndrome and tremors (Tr. 42, 44). The irritable bowel syndrome caused him to have diarrhea twice per week and have to go to the restroom six to eight times on those days (Tr. 42). The tremors caused him to have difficulty using his hands (Tr. 44). Constipation was the only reported side effect from his medication (Tr. 42-43).

On a typical day, Hall was able to dust, wash dishes, sweep, and do his own laundry (Tr. 37). He used wood to heat his home, so he sometimes cut and split wood, but had to take a break for a few minutes after doing it. *Id*. He was able to go grocery shopping and drive his car (Tr. 29, 38).

### 2. Vocational Expert Testimony

The ALJ asked the vocational expert what type of work would be able to be performed by a person of Hall's age, education, and past work experience (Tr. 46). This hypothetical individual was limited to lifting and carrying ten pounds frequently and twenty pounds occasionally. *Id*. Further, he could sit for six of eight hours, and stand and walk for six of eight hours. *Id.* This person could occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl, but could not climb ladders, ropes, or scaffolds. *Id*. He could understand, remember, and carry out simple instructions, but not detailed or complex instructions (Tr. 46-47). This individual was limited to one or two step tasks that only last for two hours at a time, and no more than occasional contact with the general public and occasional contact and superficial interaction with coworkers and supervisors (Tr. 47).

The vocational expert responded that this individual could not perform Hall's past work, but could perform other jobs, like press operator, folder, or production inspector. *Id.* The ALJ then changed the hypothetical individual to allow the individual to sit or stand as necessary. *Id.* The vocational expert said that would eliminate the press operator and folder positions, but Hall could still be a production inspector, packager, or assembler. *Id.*

### 3. ALJ Determination

On April 30, 2010, the ALJ found that Hall was not disabled (Tr. 18). Although Hall was unable to perform any past relevant work, the ALJ found that he had the residual functional capacity ("RFC") to perform light work, with certain limitations (Tr. 15).

## III. ANALYSIS

### A. Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. *See* 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhardt*, 322 F.3d 912, 915 (7th Cir. 2003). However, an ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626. Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes*, 416 F.3d at 626. An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## B.    Hall's Motion for Remand

Hall must establish that he is disabled to be entitled to benefits under the Social Security Act.  *See* 42 U.S.C. § 423(a)(1)(D).  The Act specifically defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled.  The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; *Briscoe*, 425 F.3d at 352.  If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

An impairment or combination of impairments is considered severe if the applicant's physical or mental ability to perform basic work activities is significantly limited.  20 C.F.R. § 404.1521(a).  The combination of impairments is taken into account, even if each individual impairment would not be considered severe.  20 C.F.R. § 404.1523.  If the applicant does not meet this requirement, then the applicant is not disabled.  20 C.F.R. § 404.1520(c).  In order to be considered severe, the impairment must either cause the applicant's death, or has lasted or is expected to last for a continuous period of at least 12 months.  20 C.F.R. § 404.1509.  When

assessing the severity of an impairment, the applicant's age, education, and work experience are not considered.  *Id.*  However, it is still possible for the applicant to have been disabled for a period of time in the past even if the applicant currently does not have a severe impairment.  *Id.*

If the applicant's impairment or combination of impairments meets the requirements outlined in Subpart P, Appendix 1 and also meets the duration requirement, then the applicant is disabled without considering the applicant's age, work experience, or education.  20 C.F.R. § 404.1520(d).  Once the ALJ finds that the applicant is not disabled after the first three steps, then the ALJ assesses the RFC.  20 C.F.R. § 404.1520(e).  The RFC is the applicant's ability to do physical and mental work activities on a sustained basis despite limitations.  *Id.*  Once the RFC is determined, it is compared to the applicant's past relevant work to see if the applicant could still perform that type of work.  20 C.F.R. § 404.1520(f).  If the applicant could still perform past relevant work, then the applicant is not disabled.  *Id.*  Past relevant work includes any substantial work performed within the last 15 years.  20 C.F.R. § 404.1560(b)(1).  The applicant has the burden to prove the first four steps, but upon reaching step five, the burden shifts to the Commissioner.  20 C.F.R. § 404.1520(e).

First, the Court must determine whether the ALJ properly discounted Dr. Negi's opinion. Next, the Court must consider whether the ALJ's credibility determination was reasonable. Finally, the Court must decide if the ALJ's failure to ask the vocational expert if his testimony conflicted with the DOT was error.

## 1.      The ALJ properly discounted Dr. Negi's opinion.

Hall first contends that the ALJ improperly discounted Dr. Negi's opinion.  "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to

controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004), *see* 20 C.F.R. § 404.1527(d)(2). If the ALJ does not give the treating physician's opinion controlling weight, he must present "good reasons" for discounting that opinion. *See* 20 C.F.R. §404.1527(d)(2). An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views. *Moss v. Astrue,* 555 F.3d 556, 560 (7th Cir. 2009).

Here, the ALJ discounted Dr. Negi's opinion given in the mental medical source assessment because that opinion was not accompanied by any explanation, office notes, or test results that could provide evidence for the conclusory statements in the assessment (Tr. 16). Additionally, between August 2009 and November 2009, Hall's GAF scores had improved from 20 to 55, and Dr. Negi's most recent examination of Hall showed that he had good eye contact, was cooperative, alert, and had no thoughts of suicide or homicide (Tr. 646-647). Further, the reason for Hall's last visit to Dr. Negi before Dr. Negi filled out the assessment was that he was trying to get disability benefits (Tr. 644). Therefore, this Court finds that the ALJ provided good reasons for discounting Dr. Negi's opinion. *See* 20 C.F.R. § 1527(d)(2).

### 2. The ALJ reasonably found Hall to be not credible.

Hall next contends that the ALJ improperly found him to be not credible. Since an ALJ is in a special position where he can hear, see, and assess witnesses, his credibility determinations are given special deference, and as a result, his credibility determinations will only be overturned if they are patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). An ALJ is required to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

An ALJ cannot simply state that an individual's allegations are not credible. *Id.*

When making her credibility determination, the ALJ noted that Hall testified that he could sit for one hour at a time, stand for at least two hours, walk at least one mile, and lift a substantial amount of weight at his side (Tr. 16). Additionally, Hall was able to perform almost all activities of daily living, including laundry, doing the dishes, personal hygiene, and cutting and splitting wood. *Id.* Further, it was noted in Hall's treatment records that his pain was well-controlled through medications. *Id.* The ALJ also noted several inconsistencies in the record. First, Hall claimed he had disabling mental limitations, but there was no evidence in the psychiatrist's notes that Hall ever told him that he was debilitated by depression. *Id.* Hall also made inconsistent statements about his marijuana usage. He told his psychiatrist that he had not used marijuana for four years, but tests showed otherwise. *Id.* Therefore, this Court finds that the ALJ articulated sufficient reasons for finding Hall not credible.

**3.      The ALJ's failure to ask the vocational expert if his testimony conflicted with the DOT was harmless error.**

Finally, Hall contends that the ALJ's Step 5 finding is not supported by substantial evidence because she did not ask the vocational expert if his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). "An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors, or when the VE's contrary testimony is based on information in other reliable publications." *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

Here, the ALJ did not ask the vocational expert if his testimony conflicted with the DOT. However, this is harmless error unless there actually was a conflict. *See Terry v. Astrue*, 580

F.3d 471, 478 (7th Cir. 2009). The ALJ stated that the vocational expert's testimony was inconsistent with the DOT (Tr. 18), but the DOT does not address the sit/stand option, so there is no conflict. The ALJ relied upon the vocational expert's knowledge, through professional research and experience, to allow him to identify jobs that allow for a sit/stand option (Tr. 18). Hall did not show that the vocational expert was not qualified to testify, or that there was a conflict with the jobs that he identified. Therefore, this Court finds that the ALJ's failure to ask the vocational expert if his testimony conflicted with the DOT was harmless error.

## III.    CONCLUSION

Because the ALJ did not err by discounting Dr. Negi's opinion, her credibility determination was reasonable, and her failure to ask the vocational expert if his testimony conflicted with the DOT was harmless error, Hall's motion for remand is **DENIED**. Accordingly, this Court **AFFIRMS** the ALJ's decision.

**SO ORDERED**

Dated this 26th day of March, 2012.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge